Robert C. Braun (CA No. 47500)
Edson K. McClellan (CA No. 199541)
Kenneth J. Zielinski (CA No. 258555)
Will comply with LR IA 11-2
within 45 days, per LR IA 11-2(c)
RUTAN & TUCKER, LLP
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-1931
Telephone: 714-641-5100
Facsimile:  714-546-9035
Email: bbraun@rutan.com
        emcclellan@rutan.com
        kzielinski@rutan.com

Louis M. Bubala III (NV No. 8974)
Kaempfer Crowell
50 West Liberty Street, Suite 700
Reno, Nevada 89501
Tel:  (775) 852-3900
Fax:  (775) 327-2011
Email: lbubala@kcnvlaw.com

Attorneys for Plaintiff
GEO-LOGIC ASSOCIATES, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| GEO-LOGIC ASSOCIATES, INC., a California corporation,<br><br>Plaintiff,<br><br>vs.<br><br>METAL RECOVERY SOLUTIONS, INC., a Nevada corporation, and THOM SEAL, Ph.D., an individual,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF CONTRACT (PHASE II WORK ORDER);**<br><br>**(2) BREACH OF CONTRACT (PHASE III WORK ORDER);**<br><br>**(3) MISAPPROPRIATION OF TRADE SECRETS Under NRS 600A.030 et. seq;**<br><br>**(4) MISAPPROPRIATION OF TRADE SECRETS Under 18 USC 1836(b)(1) et. seq;**<br><br>**(5) UNJUST ENRICHMENT AND RESTITUTION;**<br><br>**(6) QUANTUM MERUIT; and**<br><br>**(7) ACCOUNTING**<br><br>**JURY DEMAND** |

Plaintiff Geo-Logic Associates, Inc. ("GLA") alleges on information and belief as follows:

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question) because the  civil action arises under the laws of the United States.

2.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) (Supplemental Jurisdiction) because beyond the Court's original jurisdiction of the Federal Question, all other claims are so related that they form part of the same case or controversy under Article III of the United States Constitution.

3.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity) because the parties to this action are all citizens of different states, and the amount in controversy exceeds $75,000.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, omissions, and acts that are the subject of this action occurred within the District of Nevada, unofficial Northern Division.

### THE PARTIES

5.     GLA is and was at all relevant times a corporation organized and existing under the laws of the State of California with its principal place of business located at 2777 East Guasti Road, Ontario, California 91761.  GLA is geologic, geotechnical, civil, and environmental firm with more than 250 geologists, engineers, and support staff located in 25 offices across eight U.S. states, and an affiliate office in Peru.

6.     Defendant Metal Recovery Solutions, Inc. ("MRS") is and was at all relevant times a corporation organized under the laws of the State of Nevada with its principal place of business located at 169 Cascade, Spring Creek, Nevada 89815.

7.     Defendant Thom Seal, Ph.D., P.E. ("Dr. Seal") is and was at all relevant times an individual residing the State of Nevada.  Dr. Seal is the President of MRS and the inventor of Hydro-Jex, a "Remedial Heap Treatment" mining technology.

8.     GLA alleges that, in performing the acts and omissions alleged and at all relevant times, each of the Defendants was the agent, servant, and employee of each of the other Defendants and was at all times acting within the course and scope of such agency and employment, with the knowledge, approval, consent or ratification of each of the other Defendants.

## GENERAL ALLEGATIONS

9.     In about 2015, MRS entered into a series of contracts with third-party Goldcorp to perform mining services, utilizing Dr. Seal's Hydro-Jex mining technology, at the Los Filos Mine in Guerrero State, Mexico.

10.     While MRS procured the contracts with Goldcorp to perform mining services at the Los Filos Mine in Guerrero State, Mexico, MRS did not have the resources to supply the specialized labor which would be required.  GLA did have specialized labor, which was the key to MRS performing Phase I of the Goldcorp contracts.  Subsequent to completion of Phase I, GLA provided the know-how, specialized labor, and interface with Goldcorp, which was key to MRS procuring the Goldcorp contracts for Phases II and III.

GLA'S SPECIALIZED SOUTH AMERICAN MINING WORKFORCE

11.     With an affiliate office located in Peru, over the years GLA has spent a considerable amount of time and money in developing and maintaining a workforce in South America that has expertise in performing specialized mining operations such as those at issue in this action.

12.     Recognizing the economic value of its South American mining workforce, GLA takes reasonable steps to preserve the confidentiality of

1  information such as the employee list, contact information, and other confidential
2  information.

3       13.    As discussed below, through the GLA-MRS relationship, MRS was
4  introduced to GLA's South American mining workforce including GLA's key
5  managers.

6  <u>THE SERVICES AGREEMENT</u>

7       14.    On or about October 21, 2015, GLA entered into a Services Agreement
8  with MRS, a copy of which is attached to the Complaint as <u>Exhibit A</u> (the "Services
9  Agreement").

10       15.    Pursuant to the Services Agreement, GLA is to provide key personnel
11  to perform work for MRS at the Los Filos Mine in Guerrero State, Mexico in
12  accordance with the specifications set out in work orders, entered into from time to
13  time pursuant the Services Agreement.  The work that GLA and MRS would
14  perform together at the Los Filos Mine was to be completed in phases.

15  <u>SERVICES AGREEMENT – PHASE I WORK ORDER</u>

16       16.    On or about November 11, 2015, GLA and MRS entered into "Work
17  Order Number: 1-Hydro-Jex Operations at Los Filos Mine" ("Phase I Work Order").

18       17.    Pursuant to the Phase I Work Order, GLA performed services for MRS
19  from about November 17, 2015 through January 5, 2016.  Among other things, GLA
20  provided qualified individuals to perform operational services at the Los Filos Mine
21  Site, as directed by MRS.

22       18.    As set forth more fully in the Phase I Work Order, MRS was to pay
23  GLA on a time and material basis for project managers and support staff; pay all
24  GLA's travel costs; pay all GLA's meal and lodging expenses; and pay for or
25  provide personal protection equipment to GLA.  Further, MRS was required to pay
26  GLA for Phase I invoices within 30 days of receipt of invoices.

27       19.    GLA successfully completed its work as required by the Phase I Work
28  Order.

20.     In or about November 2016, GLA submitted an invoice to MRS for the work performed pursuant to the Phase I Work Order.  Additionally, MRS submitted an invoice to Goldcorp for the Phase I work.

21.     On or about November 18, 2016, Goldcorp paid MRS for the work performed pursuant to the Phase I Work Order.

22.     Following MRS's receipt of the payment from Goldcorp, MRS paid GLA for the work performed pursuant to the Phase I Work Order.

<u>SERVICES AGREEMENT – PHASE II WORK ORDER</u>

23.     On or about May 13, 2016, GLA and MRS entered into "Work Order Number: 2-B Hydro-Jex Operation, Phase IIb, at Los Filos Mine," a copy of which is attached the Complaint as <u>Exhibit B</u> ("Phase IIb Work Order").  Two additional Phases (IIa and IIc) were authorized and completed under the terms of the original agreement for Phase IIb.

24.     Pursuant to the Phase IIb Work Order, GLA performed services for MRS from about May 15, 2016 through September 12, 2016.  Among other things, GLA was to provide qualified individuals to supervise, manage, and perform operational services at the Los Filos Mine Site, as directed by MRS.

25.     As set forth more fully in the Phase IIb Work Order and subsequent verbal agreements for Phase IIa and IIc, and in contrast to the terms of Phase I, MRS was to pay GLA agreed-upon hourly rates for on-site project managers and support staff; pay all GLA's travel costs; pay all GLA's meal and lodging expenses; pay for or provide personal protection equipment to GLA; and pay 30% of the Phase IIa, IIb and IIc Gross Profit to GLA, in exchange for GLA's commitment to provide specialized labor at a lower initial rate and to provide corporate staff support at no cost.  Further, MRS is required to promptly pay GLA for Phase IIa, IIb and IIc invoices.

26.     GLA satisfactorily and timely completed all work pursuant to the Phase IIb Work Order and subsequent verbal Phase II agreements.

27.     On or about November 18, 2016, GLA submitted an invoice to MRS for the work performed pursuant to the Phase IIb Work Order.  In addition, MRS submitted an invoice to Goldcorp for the Phase II work.

28.     On or about December 12, 2016, Goldcorp paid MRS $291,041 for the Phase II work at the Los Filos Mine.

29.     To date, despite GLA's successful performance of services in connection with Phase IIa, b, and c, and despite GLA's repeated demands, MRS has not paid GLA for the approximately $107,000 that remains owed under the Phase IIb Work Order.

<u>SERVICES AGREEMENT – PHASE III WORK ORDER</u>

30.     On or about July 28, 2016, GLA management met with MRS to discuss a framework for a potential joint venture to market implement the Hydro-Jex technology on a broader scale.  After the July meeting, GLA began development of a Joint Venture Agreement to facilitate a long-term business relationship with Dr. Seal.

31.     On or about August 24, 2016, GLA senior management traveled to the Los Filos Mine Site to initiate negotiations for Phase III of the project.  Over the following months, GLA management engaged in numerous communications with Los Filos personnel in efforts to negotiate and secure the work order for Phase III from Goldcorp.

32.     On or about September 23, 2016, representatives of GLA again met with representatives of MRS, including Dr. Seal, to discuss Phase III of the Los Filos Mine project and the Work Order to be generated in connection with Phase III. During the meeting, GLA and MRS generally discussed Phase III's work specifications, and the parties agreed to utilize the same compensation structure for Phase III as the parties used for the Phase II Work Order (i.e., MRS pays all of GLA's costs plus 30% of the profit), with the caveat that this new work, referred to

herein as the "Phase III Work Order" was contingent upon Goldcorp awarding MRS a Phase III contract.

33.   Prior to and following that meeting, GLA spent a considerable amount of time and resources to ensure Goldcorp would award MRS the Phase III contract. GLA's work included, among other things, preparing the proposal and optimized scope to the Los Filos Mine, which led to MRS being awarded the contract on or about November 16, 2016.  As MRS was aware, between September 12, 2016 and December 3, 2016, GLA continued to pay several South American employees who were to be sent to Mexico, anticipating that they would soon be deployed to Los Filos for Phase III.   In addition, at Dr. Seal's insistence and in anticipation of moving forward with MRS on Phase III, GLA paid for two of GLA's employees to attend a class that Dr. Seal taught regarding remedial heap treatment mining technology.

34.   On or about November 16, 2016, GLA sent MRS a Phase III work order for execution, consistent with the parties' September 23, 2016 agreement.  On November 22, 2016, GLA sent a revised Phase III work order to MRS, which still reflected the same pay structure they had agreed to in September (i.e., MRS pays all of GLA's costs plus 30% of the profit).

35.   On or about November 22, 2016, MRS responded to GLA's draft work order contending, without merit, that no contract was in place for Phase III.  MRS instead demanded that "[f]or Phase III the split of profits will be 80% MRS and 20% GLA."   MRS's demand was directly contrary to the parties' months'-long agreement, upon which GLA had been operating and relying.

36.   On or about November 30, 2016, a conference call was held between representatives of GLA and representatives of MRS, including Dr. Seal.  During this conversation, Gary Lass told Dr. Seal that the newly proposed 80/20 split was not acceptable to GLA (and, in fact, was not profitable), and that Dr. Seal's last-minute attempted change of terms constituted a breach of the parties' September 23, 2016

agreement. Nevertheless, GLA offered as an alternative to the September 23, 2016 agreement to assist MRS in transitioning its work at the Los Filos Mine to MRS under three conditions: (1) that GLA's efforts would be compensated at fully burdened time and materials labor rates; (2) labor rates would also include a risk premium; and (3) MRS would issues a licensing agreement for the Hydro-Jex technology to GLA. Otherwise, the parties would keep the original September 23, 2016 agreement in place. Dr. Seal ignored GLA's alternative proposal, with the result that the original September 23, 2016 agreement remained effective.

37.    The work on Phase III was scheduled to begin on Monday, December 5, 2016. GLA made flight and other arrangements for its South American workforce to travel to the Los Filos Mine Site to commence the work.

38.    On Friday, December 1, 2016, just four days before the South American workforce was scheduled to fly to Los Filos, MRS presented GLA with a completely new contract for Phase III, which evidenced that MRS was backing out of the previous compensation agreement for Phase III. In the new proposed contract, MRS indicated that the profit split would be 75/25 instead of 70/30 (as previously agreed), and MRS insisted that the Work Order allow MRS to hire GLA's South American workforce. MRS refused to move forward under the 70/30 agreement that had been previously agreed to, and on which GLA had relied.

39.    This new demand, just days before Phase III was to commence, stunned GLA. The demand was unfair and untimely, as GLA had invested hundreds of hours of work and tens of thousands of dollars to secure the Phase III work, and GLA had seven of its South American employees packed and ready to travel to Los Filos.

40.    MRS's 11th hour refusal to perform under the agreement the parties reached back in September 2016 constituted a breach of their agreement for the performance of the Phase III work. GLA told MRS that MRS was in breach of their

agreement, and that GLA would not be coerced into accepting this untimely and unfair deal that MRS was attempting to force upon GLA at the last moment.

### DEFENDANTS' UNLAWFUL SOLICITATION OF GLA'S SPECIALIZED SOUTH AMERICAN MINING WORKFORCE

41. At the end of Phase I at the Los Filos Mine Site, MRS contacted GLA Los Filos supervising staff, inquired about their levels of compensation, and suggested that if they were to become independent contractors, MRS could hire them without GLA. At the time, MRS also requested certain managers of GLA's South American mining workforce financial incentives to divulge trade secret information relating to GLA's South American employees, such as employee contact information, contract terms, and compensation information (collectively the "Trade Secret Employee Information"). MRS sought this information to wrongfully solicit the South American employees to provide services directly to MRS.

42. After MRS breached the parties' agreement for Phase III work, MRS initially staffed the project using independent contractors, including Auroch Minerals. MRS's initial efforts at implementing the Hydro-Jex technology using non-GLA staff were unsuccessful. When MRS could not find a lawful means to attempt to find experienced staff for this specialized project, MRS wrongfully used GLA's Trade Secret Employee Information to solicit and hire a former senior GLA employee with extensive experience at Los Filos. This former senior GLA employee in turn, with Defendants' encouragement, used GLA's Trade Secret Information to recruit away more of GLA's South American workforce. Dr. Seal told members of GLA's South American workforce, recruited away to work for MRS, not to tell GLA that MRS had hired them. GLA's former Los Filos workforce began working directly for MRS at the Los Filos Mine pursuant to the Phase III contract that GLA helped procure for MRS.

43. GLA is informed and believes that the profit on Phase III was in excess of $3 million. MRS has yet to pay GLA the agreed-upon profit split.

# FIRST CLAIM FOR RELIEF

## Breach of Contract – Phase II Work Order

## (Against Defendant MRS)

44.     GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

45.     As alleged above, GLA and MRS entered into the Services Agreement and Phase II Work Order, copies of which are attached to the Complaint as Exhibits A and B.

46.     Pursuant to the Phase IIb Work Order, MRS agreed, *inter alia*, to the following: to pay GLA specific rates for project managers and support staff; pay all GLA's travel costs; pay all of GLA's meal and lodging expenses; pay for or provide personal protection equipment to GLA; and pay 30% of the Phase IIa, b, and c Gross Profit to GLA.

47.     MRS has breached the Phase IIb Work Order by, among other things, failing to pay GLA approximately $107,000, which is comprised of approximately $31,116 in unpaid costs and approximately $75,577 in unpaid profits.

48.     GLA has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Service Agreement and Phase IIb Work Order.

49.     As a direct and proximate result of MRS's breaches of contract, GLA has suffered compensatory damages, together with interest at the maximum legal rate from the date said sum became due, in an amount to be proven at trial, but not less than $107,000.

50.     GLA has been forced to employ counsel to enforce its rights under the Phase IIb Work Order and, therefore, GLA is entitled to reasonable attorneys' fees and costs incurred herein.

## SECOND CLAIM FOR RELIEF

### Breach of Contract – Phase III Work Order

### (Against Defendant MRS)

51.     GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

52.     GLA entered into a Phase III Work Order agreement with MRS, some of the terms of which were memorialized in the written draft Phase III work orders, and some of the terms of which were agreed upon orally as set forth above.  MRS agreed in the Phase III Work Order to pay GLA for Phase III work in the same manner as MRS paid GLA for Phase II work (i.e., MRS pays all of GLA's costs plus a 30% split of the profit).

53.     GLA relied on MRS's promises in connection with the Phase III Work Order and spent considerable time and resources securing the contract from Goldcorp for the Phase III work.  GLA also continued to pay its South American workforce, anticipating that the employees would soon be dispatched to Los Filos.

54.     MRS breached the Phase III Work Order by refusing to move forward with the parties' agreed-upon compensation structure, by which GLA would have received over $1,000,000 in profits.  MRS also breached the Phase III Work Order by refusing to perform under the agreement unless GLA agreed, in effect, to allow MRS to hire its South American workforce.

55.     GLA has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Phase III Work Order, or such has been excused.

56.     As a direct and proximate result of these breaches of contract, GLA has suffered compensatory damages, together with interest at the maximum legal rate from the date said sum became due, in an amount to be proven at trial, but not less than $1,000,000.

57.     GLA has been forced to employ counsel to enforce its rights under the

1  Phase III Work Order and, therefore, GLA is entitled to reasonable attorneys' fees

2  and costs incurred herein.

3  ### THIRD CLAIM FOR RELIEF

4  **Trade Secret Misappropriation**

5  **Under Nevada Revised Statutes, Chapter 600A**

6  **(Against All Defendants)**

7  58.   GLA incorporates by reference as though fully set forth herein all

8  previous paragraphs of this Complaint.

9  59.   Through the considerable expenditure of time, effort, and capital, GLA

10  has developed commercially valuable trade secret information, including the Trade

11  Secret Employee Information.

12  60.   Before the conduct of Defendants as alleged in this Complaint, GLA's

13  Trade Secret Employee Information had independent economic value that was

14  derived from the fact that it was not generally known to the public or to GLA's

15  competitors, who could obtain economic value from its disclosure or use.  GLA

16  developed and obtained these trade secrets over the years through considerable

17  effort and expense, and thereby achieved a substantial business advantage.  The fact

18  that MRS first tried at the end of Phase I to induce and entice employees away from

19  GLA and then to assemble its own workforce to work on Phase III, but failed, is

20  evidence of the difficulty and resources needed to compile a workforce for such

21  specialized work.

22  61.   GLA has taken reasonable efforts to maintain the confidentiality of its

23  Trade Secret Employee Information, and to protect such information from

24  disclosure to its competitors.  Those efforts include requiring employees to sign and

25  abide by the provisions in confidentiality agreements protecting the confidentiality

26  of proprietary information and limiting access to trade secret information on a need-

27  to-know basis.

28

62.     As alleged in this Complaint, Defendants misappropriated GLA's Trade Secret Employee Information and used it to directly solicit GLA's South American workforce.   Defendants have used this information to gain an unfair advantage over GLA in the marketplace.

63.     GLA seeks an Order from this Court compelling Defendants to return to GLA any and all Trade Secret Employee Information obtained.

64.     As a proximate result of Defendants' conduct, GLA has been and will continue to be damaged.   Unless enjoined by this Court, Defendants' unlawful use of the Trade Secret Employee Information has and will continue to cause great and irreparable injury to GLA.   GLA has no other adequate remedy at law for such acts and threatened acts.   GLA therefore requests that during the pendency of this action, this Court issue a preliminary injunction, and that after trial, this Court issue a permanent injunction, restraining and enjoining Defendants and their agents, employees, attorneys and representatives, and anyone acting at their direction, from (1) soliciting GLA's current and former South American workforce by use of the Trade Secret Employee Information; (2) employing or otherwise utilizing the services of current and former GLA employees whose contact and other information Defendants acquired by virtue of their misappropriation of the Trade Secret Employee Information; and (3) prohibiting Defendants from any further use of the misappropriated trade secrets.

65.     As a direct and proximate result of Defendants' unlawful conduct, GLA has been and will continue to be damaged in an amount that is in excess of this Court's minimum jurisdiction, which includes, among other things, actual damages for loss of valuable information, loss of competitive advantage gained by such information, loss of profits, lost management time, costs incurred attempting to mitigate damages, and legal costs and expenses.   GLA is entitled to damages in an amount to be proven at trial.

66.    As a further proximate result of Defendants' misappropriation, GLA alleges that Defendants have been unjustly enriched.  The amount of this unjust enrichment cannot presently be ascertained, but will be determined at the time of trial.

67.    GLA is additionally entitled to a reasonable royalty based on Defendants' misappropriation.

68.    Based on the intentional, willful and malicious nature of Defendants' actions, GLA is entitled to recover exemplary damages and reasonable attorneys' fees and costs incurred in connection with this action.

## FOURTH CLAIM FOR RELIEF

### Trade Secret Misappropriation

### under U.S. Code, Title 18

### (Against All Defendants)

69.    GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

70.    GLA is the owner of a trade secret, the Trade Secret Employee Information.

71.    The Trade Secret Employee Information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

72.    Defendants have misappropriated the Trade Secret Employee Information.

73.    As a proximate result of Defendants' conduct, GLA has been and will continue to be damaged.  Unless enjoined by this Court, Defendants' unlawful use of the Trade Secret Employee Information has and will continue to cause great and irreparable injury to GLA.  GLA has no other adequate remedy at law for such acts and threatened acts.  GLA therefore requests that during the pendency of this action, this Court issue a preliminary injunction, and that after trial, this Court issue a permanent injunction, restraining and enjoining Defendants and their agents,

employees, attorneys and representatives, and anyone acting at their direction, from (1) soliciting GLA's current and former South American workforce by use of the Trade Secret Employee Information; (2) employing or otherwise utilizing the services of current and former GLA employees whose contact and other information Defendants acquired by virtue of their misappropriation of the Trade Secret Employee Information; and (3) prohibiting Defendants from any further use of the misappropriated trade secrets.

74.     As a direct and proximate result of Defendants' unlawful conduct, GLA has been and will continue to be damaged in an amount that is in excess of this Court's minimum jurisdiction, which includes, among other things, actual damages for loss of valuable information, loss of competitive advantage gained by such information, loss of profits, lost management time, costs incurred attempting to mitigate damages, and legal costs and expenses.  GLA is entitled to damages in an amount to be proven at trial.

75.     As a further proximate result of Defendants' misappropriation, GLA alleges that Defendants have been unjustly enriched.  The amount of this unjust enrichment cannot presently be ascertained, but will be determined at the time of trial.

76.     GLA is additionally entitled to a reasonable royalty based on Defendants' misappropriation.

77.     Based on the intentional, willful and malicious nature of Defendants' actions, GLA is entitled to recover exemplary damages and reasonable attorneys' fees and costs incurred in connection with this action.

### FIFTH CLAIM FOR RELIEF

### Unjust Enrichment and Restitution

### (Against Defendant MRS)

78.     GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

79.   MRS has been unjustly enriched by its wrongful conduct directed toward GLA, as alleged herein, at GLA's expense.  It would be unjust for MRS to retain any value it obtained as a result of its wrongful conduct.

80.   GLA is accordingly entitled to full restitution of all amounts by which MRS has been unjustly enriched at GLA's expense.

## SIXTH CLAIM FOR RELIEF

### Quantum Meruit

### (Against Defendant MRS)

81.   GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

82.   GLA provided substantial services to MRS in connection with the Phase II and Phase III Work Orders, as alleged above.  MRS accepted and enjoyed those services, although now refuses to pay GLA for the value of those services.

83.   MRS is indebted to GLA for the reasonable value of the services that GLA provided under a theory of quantum meruit.

## SEVENTH CLAIM FOR RELIEF

### Accounting

### (Against Defendant MRS)

84.   GLA incorporates by reference as though fully set forth herein all previous paragraphs of this Complaint.

85.   MRS has misappropriated GLA's trade secret information and has breached agreements with GLA, as alleged in this Complaint.  MRS has received money as a result of its misconduct, at GLA's expense, and some or all of such money is rightfully due to GLA.

86.   The precise amount of money due from MRS to GLA is unknown to GLA and cannot be ascertained without an accounting of the income and gross profits MRS obtained through its illegal conduct as alleged in this Complaint.  GLA is entitled, therefore, to a full accounting.

## PRAYER FOR RELIEF

GLA prays for judgment against Defendants MRS and Dr. Seal as follows:

1. For compensatory damages, according to proof at trial, in excess of $1,000,000;

2. For lost profits, according to proof at trial, in excess of $1,000,000;

3. For a reasonable royalty for Defendants' misappropriation of GLA's trade secret information;

4. For restitution and disgorgement;

5. For the reasonable value of GLA's services;

6. For punitive damages according to proof at trial;

7. For prejudgment interest;

8. For attorneys' fees and costs;

9. For an accounting;

10. For preliminary and permanent injunctive relief; and

11. For such other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  September 13, 2017                KAEMPFER CROWELL

                                         By:_____/s/Louis M. Bubala III_____
                                              Louis M. Bubala III
                                              Attorneys for Plaintiff
                                              GEO-LOGIC ASSOCIATES, INC.

# Exhibit "A"

# Exhibit "A"

**SERVICES AGREEMENT**
**(Corporate Contractor)**

THIS AGREEMENT made effective **October 21, 2015** (the "**Effective Date**") is BETWEEN:

> **METAL RECOVERY SOLUTIONS, INC., A NEVADA CORPORATION**
> ("**MRS**"), of PO Box 8353 Spring Creek, NV 89815

AND:

> **GEO-LOGIC ASSOCIATES**, a California corporation ("**Contractor**"), dba
> Applied Soil Water Technologies, 56 Coney Island Drive, Sparks, Nevada 89431

**BACKGROUND**

A.    MRS desires to retain the Contractor to provide the Services (as defined herein) for the benefit of MRS's Hydro-Jex technology at the **Los Filos Mine Site**, and at or for the benefit of such other future MRS projects as agreed to between MRS and the Contractor (individually a "**Site**" and collectively, the "**Sites**").

B.    The Contractor has the capacity and desires to perform the Services.

**AGREEMENT**

For good and valuable consideration, the receipt and sufficiency of which each party acknowledges, the parties agree as follows:

1.  **Services.** The Contractor shall provide contracting services (the "**Services**") to or for the benefit of MRS in accordance with the specifications (the "**Specifications**") set out in work orders (each of which is a "**Work Order**") entered into from time to time pursuant to this Agreement. Neither party is obligated to enter into any Work Order.  MRS is not required to request any minimum volume of work from the Contractor.    If there is a conflict between this Agreement and a Work Order, this Agreement shall prevail except to the extent that the Work Order specifically refers to the conflicting provision and overrides it. From time to time, MRS may submit a written change order to make any changes, including additions to or deletions to the Services, or in the specifications or drawings for any of the Services. If such change affects the amount due or the time of performance hereunder, the Contractor shall advise MRS of the proposed change in the amount due or the time of performance. No such change in the amount due or time of performance shall be effective until approved in writing by MRS, following which all the terms and conditions in this Agreement shall apply to any changes, additions, deviations or additional Services ordered by MRS in like manner and to the same extent as to the Services originally contracted for herein.

2.  **Access to sites where MRS has a service agreement with the Site owner.** During the term of this Agreement, and subject to the Contractor's compliance with section 3, the Site owner may grant to the Contractor such access to those portions of the Site(s) and other premises (collectively, the "**Owner's Premises**") as is necessary for the Contractor to perform its

2

obligations under this Agreement and provided that such access does not disrupt the operations at a Site(s) or its other contractors.

3. **Owner's Premises (Goldcorp Codes and Policies).** The Contractor shall comply with Site or Goldcorp's Code of Conduct and all Goldcorp policies (including site-specific occupational health and safety and security policies), of which the Contractor receives prior written notice, when providing the Services.

4. **Key Individuals.** Unless MRS agrees to otherwise in writing, the Contractor shall provide the Services only through the **"Key Individual"** or **"Key Individuals"** listed in a Work Order. If MRS agrees in writing that the Services may be provided through any other person, then that person shall automatically be considered a "Key Individual" for the purposes of this Agreement. If MRS is not satisfied with a Key Individual, the Contractor shall promptly provide a replacement individual satisfactory to MRS and the Site Owner.

5. **Contractor's Personnel.** In this Agreement, **"Contractor's Personnel"** means the Key Individuals and the Contractor's and its affiliates' employees, agents, contractors and other representatives who provide Services under this Agreement. References in this Agreement to the "Contractor's Personnel" do not limit or override the Contractor's obligations under section 4. The Contractor shall cause the Contractor's Personnel to: (a) comply with the Contractor's obligations under this Agreement, and (b) if requested by MRS and Goldcorp, sign a confidentiality and proprietary rights agreement with MRS and Goldcorp to confirm their intellectual property and confidentiality obligations under this Agreement.

6. **Information.** The Contractor shall keep MRS informed of the Contractor's progress on the Services (including all material problems encountered) and shall provide MRS and with all documents, software, screen shots and other information relating to the Services as requested from time to time.

7. **Deliveries.** The Contractor shall deliver Work Product to MRS and Goldcorp as set out in the Work Order or as requested by MRS and Goldcorp from time to time. From time to time upon MRS or Goldcorp's request, the Contractor shall also deliver to MRS or Goldcorp all Work Product in the possession or control of the Contractor and the Contractor's Personnel in whatever stage of completion it might be, regardless of when the Work Product is scheduled to be delivered.

In this Agreement, **"Work Product"** means:

(a) all reports, analyses, presentations, software, code, documentation, branding, trade-marks, designs, scripts and content created by or for the Contractor or the Contractor's Personnel under this Agreement;

(b) all technical documentation required for a third party to understand, support, modify and troubleshoot the other deliverables, and all user documentation required for an end user to understand and use the other deliverables; and

(c) all other work product created in connection with the Services.

8. **Fees and Reimbursement of Expenses.** MRS shall pay Contractor the fees set-out in each Work Order on the dates and in the manner set out in each Work Order (the **"Fees"**), plus any applicable sales or goods & services taxes and any expenses MRS has pre-approved in

3

writing. The Contractor shall not exceed any maximum fees specified by any Work Order without MRS's prior written approval.

MRS shall have the right to inspect, upon demand, all receipts and other documents demonstrating expenditures for which the Contractor requests reimbursement by MRS. MRS shall have no obligation to provide reimbursement for any expense that is not fully supported by a receipt or other substantiating document. Upon request by MRS, Contractor shall supply MRS with all relevant receipts or other supporting documents at the time a claim for reimbursement of expenses is submitted to MRS.

No expenses related to the entertainment, travel, or lodging of government officials shall be reimbursed by MRS unless those expenses are pre-approved in writing by MRS.

9. **Invoicing and Payment.** Unless the Work Order says otherwise, the Contractor shall invoice MRS monthly for Services performed in accordance with the Specifications, and MRS shall pay all undisputed invoices within thirty (30) days of receipt.

10. **Confidentiality.** The Contractor shall (and shall cause the Contractor's Personnel to) keep the Protected Information strictly confidential, and shall not:

    (a)    use, duplicate, transfer, publish, transmit, modify, reverse-engineer or take any benefit from it except as required to perform the Services; or

    (b)    disclose any Protected Information to anyone unless MRS consents or unless the Contractor is required by law or court order to do so; or

    (c)    directly or indirectly assist or encourage any third party to do any of the above activities.

If the Contractor is required to disclose Protected Information by law or court order, the Contractor shall provide MRS with sufficient advance notice to enable MRS the opportunity to contest the disclosure or obtain a protective order and the Contractor shall strictly limit such disclosure to the Protected Information which the Contractor is advised, in writing, by legal counsel as being legally required to be disclosed.

The Contractor shall also use and take all reasonable security measures to protect the Protected Information from loss, theft and unauthorized use, access, disclosure, duplication, modification and deletion.

The Contractor acknowledges that unauthorized use or disclosure of Protected Information shall likely cause irreparable injury to MRS that shall not be readily measurable in monetary damages. In the event of an unauthorized use or disclosure of Protected Information, MRS shall be entitled to an injunction against the Contractor (without waiving any other rights at law or in equity).

The Contractor agrees that upon written request by MRS it shall promptly return to MRS or permanently destroy and delete all Protected Information and any and all copies thereof in its possession.

In this Agreement:

    **"Confidential Information"** means:

        (i)    the existence and terms of this Agreement;

4

(ii)    the Work Product;

(iii)    all information and data relating to MRS and Site Owner's or to MRS business, strategies, pricing, personnel, customers, suppliers, products, equipment or services; and

(iv)    all information belonging to third parties in respect of which MRS owes any obligation of confidentiality;

whether in oral, written or electronic form, and whether or not any of the foregoing information is identified as being confidential, but excludes the Excluded Information.

**"Excluded Information"** means information that the Contractor proves:

(i)    was lawfully in its possession before receiving it from MRS;

(ii)    was provided in good faith to the Contractor by a third party without breaching any of Goldcorp's rights or any rights of a third party;

(iii)    is or becomes generally available to the public through no fault of the Contractor; or

(iv)    is independently developed by the Contractor without reliance upon Confidential Information.

**"Personal Information"** means any information about an identifiable individual (including an employee, customer, supplier, director, officer or shareholder of MRS) that the Contractor obtains from or through MRS, regardless of whether the information is Confidential Information.

**"Protected Information"** means Confidential Information and Personal Information.

11. **Intellectual Property in Work Product.** All of the Contractor's and Contractor's Personnel's right, title and interest throughout the world in and associated with Work Product and all Intellectual Property Rights (defined below) in and to the Work Product shall be the exclusive property of MRS automatically upon generation or creation of it. To the extent that the Contractor holds or acquires legal title in any of the Work Product or the related Intellectual Property Rights, the Contractor declares and confirms that the Contractor holds that legal title only as trustee for the exclusive benefit of MRS.

All Contractor Background IP (defined below) shall remain the Contractor's exclusive property. The Contractor shall not include any Contractor Background IP in any of the Work Product. In the event that any Contractor Background IP may be included as part of the Work Product, the Contractor and MRS shall negotiate in good faith the terms of any additional rights that may be necessary for MRS to exploit the Contractor Background IP in connection with the Work Product. However, MRS shall only acquire right, title and interest in the Work Product created by Contractor after Contractor has been paid for the services that resulted in the creation of that Work Product. _ In this Agreement:

**"Contractor Background IP"** means pre-existing knowledge, trade secrets, know-how or other intellectual property owned by the Contractor prior to performing any services for MRS, and listed in a Work Order as "Contractor Background IP".

5

"**Intellectual Property Rights**" means all proprietary and other rights provided under patent law, industrial design law, copyright law, trade-mark law, trade secret law, and any other intellectual property law, including any statutory provision, common law principle or contractual obligation which may provide a right in ideas, formulae, algorithms, concepts, inventions, confidential information or know-how generally, or the expression or use of ideas, formulae, algorithms, concepts, inventions, confidential information or know-how.

12. **Moral Rights and Personality Rights.** MRS may use, copy, display, transmit, alter, vary, adapt and exploit all Work Product as it sees fit, in all media and in all manner whatsoever, including in presentations, merchandising, advertising, commercial tie-ins, corporate materials and otherwise, without any further payment to the Contractor, the Contractor's Personnel or any third party.   The Contractor, on its own behalf and as agent for the Contractor's Personnel:

   (a)   waives in favour of MRS all "moral rights" and "droits d'auteurs" that the Contractor or any of the Contractor's Personnel may have in the Work Product; and

   (b)   releases MRS from all claims or causes of action the Contractor or any of the Contractor's Personnel may have for defamation, invasion of privacy, violation of personality rights and otherwise in connection with the exploitation of MRS's rights under this Agreement.

   (c)   However, MRS shall only acquire right, title and interest in the Work Product created by Contractor after Contractor has been paid for the services that resulted in the creation of that Work Product.

13. **Further Assurances.** The Contractor shall, at MRS's reasonable expense:

   (a)   execute and deliver to MRS all instruments and take all other actions that MRS may reasonably require to:

        (i)   effect, perfect, register, or record its interest in the Work Product; or

        (ii)   record the releases and waivers and give full effect to its rights under sections 11 and 12; or

        (iii)   otherwise give full effect to this Agreement,

        at any time before or after termination of this Agreement; and

   (b)   cause the Contractor's Personnel to do the same;  promptly when requested to do so by MRS.

14. **Term.** This Agreement shall commence on the Effective Date and continue until terminated in accordance with the terms of this Agreement.

15. **Termination by Either Party.** Either party, at its option and without prejudicing any other rights it may have under this Agreement, may terminate this Agreement in writing if the other party:

   (a)   breaches any of its obligations under this Agreement in any material respect;  or

6

(b)     makes a general assignment for the benefit of creditors; or makes a written admission of its inability to pay its debts or obligations as they become due; or on becoming bankrupt or insolvent, takes the benefit of any law in force for the bankrupt or insolvent debtor; or seeks, consents to or acquiesces in the appointment of any trustee, receiver or liquidator of its business or its assets.

16. **Termination for Convenience.** Each of the parties may also, in its sole discretion, terminate this Agreement at any time by giving thirty (30) days' notice in writing. However, the Contractor may not terminate this Agreement for convenience until all of the Contractor's obligations under any outstanding Work Order(s) have been completed.

17. **Effect of Termination.** Unless agreed to otherwise in writing by the parties, upon the termination of this Agreement, without prejudice to any other rights which the parties may have:

(a)     all Work Orders shall terminate automatically;

(b)     the Contractor shall immediately stop providing the Services;

(c)     the Contractor shall immediately deliver to MRS all material in its possession or control that bears, embodies, or reveals any Work Product, Protected Information, or materials supplied to the Contractor by MRS;

(d)     MRS shall pay all sums then due and owing to the Contractor for Services provided in accordance with the Specifications; and Work Orders.

(e)     sections 10, 11, 12, 13, 17, 19(b), 19(d)(iv), 19(d)(vii), 19(d)(viii), 19(d)(x), 20, 21, 22, 24, 25, 26, 27 and all other provisions necessary to give effect thereto, shall survive termination of this Agreement.

18. **Representations and Warranties.** Each party represents and warrants to the other that:

(a)     it has the capacity to enter into and be bound by this Agreement;

(b)     the carrying out of this Agreement shall not breach or interfere with any other agreement which it has entered into; and

(c)     it shall not enter into another agreement or do or fail to do any act which would prevent it from complying with its obligations under this Agreement.

19. **Contractor Representations, Warranties and Covenants.** The Contractor represents, warrants and covenants to MRS that:

(a)     the Contractor and the Contractor's Personnel have (and, during the term of this Agreement, shall always have) the necessary skills and experience to perform the Services in accordance with Goldcorp's requirements;

(b)     all Work Product and Contractor Background IP, and the exploitation of the Work Product and Contractor Background IP by MRS or MRS's licensees, shall not violate or infringe any of the rights (including Intellectual Property Rights) of any third party;

(c)     all Key Individuals are employees of the Contractor, except as otherwise agreed to in any Work Order;

7

(d)     the Contractor shall, and shall cause the Contractor's Personnel to:

   (i)     comply with section 3 and all applicable laws when providing the Services (including, without limitation, all environmental, occupational health and safety and anti-corruption and anti-bribery laws);

   (ii)    perform the services in a professional manner in accordance with at least the generally accepted standards of prudence in the Contractor's industry and shall use only legitimate and ethical business practices in its commercial operations and in its dealings with government agencies;

   (iii)   upon at least two (2) days' notice, provide MRS with access to the Contractor's premises and records and other requested information so that MRS can inspect or audit the Contractor's activities and documents to verify the Contractor's compliance with this Agreement;

   (iv)    not violate or infringe, or cause MRS or any third party to violate or infringe, any third party's Intellectual Property Rights (defined in section 11) or other rights while providing the Services, as a result of providing the Services or as a result of MRS exercising any of its rights under this Agreement in connection with the Work Product or Contractor Background IP, including making, using, copying, modifying, displaying, telecommunicating, or otherwise exploiting any of the Work Product or Contractor Background IP;

   (v)     not include any third party software, tools or other content (the "**Third Party Content**") in any of the Work Product without: (i) MRS's prior written approval and, (ii) first obtaining for MRS a non-exclusive, worldwide, royalty-free, perpetual, irrevocable, transferable, sub licensable and fully paid-up licence to make, use, copy, modify, display, telecommunicate, sublicense and otherwise exploit the Third Party Content;

   (vi)    ensure that the Work Product and Contractor Background IP does not contain any backdoors, disabling code, viruses, Trojan horses, hidden code, open source software or anything similar without Goldcorp's prior written approval;

   (vii)   not use, copy, disclose, exploit or take any benefit from any of the Work Product in any way except as required to perform the Services;

   (viii)  not hire, solicit, induce or attempt to induce any employee of MRS to leave his or her employment with MRS during the term of this Agreement or twelve (12) months after the expiration or termination of this Agreement, except in connection with a general solicitation for employment or where such employment has been terminated;

   (ix)    take care of all property belonging to MRS which the Contractor may have access to or which may be in the Contractor's possession, care or control, and only use that property as necessary to perform the Services in accordance with MRS's instructions; and

8

(x)      never withhold any of MRS's data or other property from MRS, even in the event of a dispute between the parties;

(e)      in connection with past activities related to the business of MRS, neither the Contractor nor any of the Contractor's Personnel have ever offered, paid, promised to pay, or authorized the payment of any money or anything else of value, whether directly or through another person or entity, to:

      (i)      any government official or political party in order to (A) influence any act or decision of such official or party, (B) induce such official or party to use his or its influence with a government or instrumentality thereof, or (C) otherwise secure any improper advantage; or

      (ii)      any other person in any manner that would constitute commercial bribery or an illegal kickback, or would otherwise violate the *Foreign Corrupt Practices Act* (United States), the *Corruption of Foreign Public Officials Act* (Canada) and such other anti-bribery and anti-corruption laws to which the Contractor, the Contractor's Personnel or the subject matter of this Agreement may be subject to (the "**Applicable Anti-Bribery Laws**");

(f)      in carrying out its responsibilities under this Agreement, neither the Contractor nor any of the Contractor's Personnel shall offer, pay, promise to pay, or authorize the payment of any money or anything else of value, whether directly or through another person or entity, to:

      (i)      any government official or political party in order to (A) influence any act or decision of such official or party, (B) induce such official or party to use his or its influence with a government or instrumentality thereof, or (C) otherwise secure any improper advantage; or

      (ii)      any other person in any manner that would constitute commercial bribery or an illegal kickback, or would otherwise violate Applicable Anti-Bribery Laws;

(g)      except as disclosed to MRS in writing, neither the Contractor nor any of the Contractor's Personnel have ever conducted or initiated any internal investigation, made a voluntary or other disclosure to a government authority, or received any notice or citation related to alleged violations of Applicable Anti-Bribery Laws;

(h)      neither the Contractor nor any of the Contractor's Personnel appears on the U.S. Treasury Department's List of Specially Designated Nationals and Blocked Persons nor the lists maintained by Canada Department of Foreign Affairs, Trade and Technical Barriers Bureau under the *Export and Import Permits Act* and by the Minister of Foreign Affairs under the *United Nations Act* and *Special Economic Measures Act* (collectively, the "**SDN Lists**"), and none of the proceeds or other consideration associated with this Agreement are intended to be or shall be received by, or used to fund activities or investments in or with, a Target Country or with any entity or individual appearing on the SDN Lists. "**Target Country**" means Iran, Sudan, Cuba, Burma (Myanmar), Syria, North Korea, Belarus, and Zimbabwe;

9

(i)    except where specifically consented to in writing by MRS, no government official and no close relative or family member of such an official (i) holds or shall hold an ownership or other economic interest, direct or indirect, in the Contractor or (ii) serves as an officer, director, or employee of the Contractor;

(j)    in carrying out its responsibilities under this Agreement, the Contractor shall maintain books and records practices and internal controls so as to ensure that:

     (i)    receipts and expenses are accurately recorded and are based on accurate and sufficient supporting documentation; and

     (ii)   no "off the books" accounts are created or maintained; and

(k)    if the Contractor becomes aware that any breach or violation of sections 19(e) through to (j) has occurred, is threatened, or has been requested by any person or entity (including an employee or representative of MRS), it shall provide prompt notice to MRS of the facts and circumstances associated with such breach or violation and, in the event MRS has reason to believe that such a breach or violation has occurred or is likely to occur, it may withhold further payments until such time as it has received confirmation to its satisfaction that no such breach or violation has occurred or shall occur. MRS shall not be liable to the Contractor for any claim, losses, or damages of any kind related to its decision to withhold payments under this subsection and notwithstanding any other provision of this Agreement, MRS shall not be obligated to take any action or omit to take any action under this Agreement that it believes, in good faith, would cause it to be in violation of any anti-bribery or anti-corruption law of any country to which it is subject.

The Contractor shall have materially breached this Agreement if any of these representations and warranties is ever materially untrue or if any of these covenants are breached.

20. **Goldcorp Transportation.** MRS with Goldcorp may in its sole discretion permit the Contractor to transport Contractor's Personnel on aircraft, helicopters, busses, or other vehicles owned, operated or chartered by Goldcorp (collectively, **"Goldcorp Transportation"**). Any such Goldcorp Transportation shall be (a) on a space available basis; (b) without charge to Contractor or the Contractor's Personnel; and (c) solely for the convenience of the Contractor in furtherance of the Contractor's obligations under this Contract. Goldcorp and MRS shall not have any liability to the Contractor or the Contractor's Personnel, however arising, whether in tort, contract or otherwise, as a result of or arising out of or in connection with the Goldcorp Transportation. Goldcorp may as a condition of its agreement to transport the Contractor's Personnel require each of the Contractor's Personnel to enter into a written waiver of liability in the form specified by Goldcorp.

21. **Contractor Indemnity.** The Contractor shall indemnify and save harmless MRS and Goldcorp, its affiliates and their respective directors, officers, employees and agents (collectively, the **"Indemnified Parties"**) from and against all damages, liabilities, costs and expenses (including legal fees and costs) claimed against or incurred by any of the Indemnified Parties in connection with:

(a)      any claims by a third party arising from a breach of this Agreement by the Contractor or any of the Contractor's Personnel or any breach of a representation made by the Contractor in this Agreement;

(b)      injury or death to person or damage or destruction to property of the Contractor or any of the Contractor's Personnel incurred while any of the Contractor's Personnel are on Goldcorp Premises, except to the extent caused by the gross negligence or wilful misconduct of an Indemnified Parties; and

(c)      the transportation of the Contractor's Personnel utilizing Goldcorp Transportation as provided in this Agreement to the extent of any negligence or wilful misconduct of Contractor, Personnel or its representatives or agents.

22. **Use of Goldcorp and MRS's Name and Logo.** The Contractor must not use any of Goldcorp's or MRS's trade-marks or trade names, including the GOLDCORP and the Hydro-Jex® name or logo (collectively, the "**Marks**"), without MRS or Goldcorp's prior written permission.

If Goldcorp or MRS permits the Contractor to use any of the Marks, then the Contractor must:

(a)      only use the Marks as explicitly permitted by Goldcorp and MRS in writing from time to time;

(b)      only use the Marks in communications relating to authorized Goldcorp and MRS business;

(c)      prominently add the following disclaimer (or an alternative disclaimer approved by Goldcorp and MRS in writing) whenever using the Marks: "[Contractor] is a Goldcorp or MRS contractor and is not authorized to enter into agreements or incur liability on behalf of Goldcorp or MRS";

(d)      not use any of the Marks on any websites, advertising, or public forums;

(e)      comply with all Goldcorp and MRS graphic standards and other policies after being notified of them;

(f)      permit and assist Goldcorp and MRS to review the Contractor's use of the Marks from time to time; and

(g)      immediately discontinue all use and display of the Marks upon Goldcorp's or MRS request.

All goodwill associated with Contractor's use of the Marks shall automatically enure entirely to Goldcorp and MRS.

23. **Intellectual Property Infringement.** In addition to the Contractor's obligations under section 21, if the exploitation of any of the Work Product or Contractor Background IP by Goldcorp, MRS or its affiliates or any of their customers or licensees violates or infringes any third party rights, the Contractor shall promptly at its sole expense either:

(a)      procure for Goldcorp and MRS the right to continue the activity that gave rise to the violation or infringement; or

11

(b)    modify or replace the portion of the applicable project that caused the violation or infringement, so that the modified or replaced item complies with the Specifications and no longer causes any violation or infringement of third party rights.

24. **Limitation of Liability.** Except with respect to the Contractor's indemnification obligations relating injury or death to person or damage or destruction to property; the Contractor's indemnification obligations relating to infringements or violations of Intellectual Property Rights; and the Contractor's breach of confidentiality obligations:

(a)    neither party shall be liable to the other for any special, consequential or indirect damages; and

(b)    neither party's total liability to the other under this Agreement shall exceed three (3) times the total amounts paid to the Contractor by MRS under this Agreement.

25. **Insurance.** Throughout the term of this Agreement and for a period of one year thereafter, the Contractor shall maintain at its own expense, with an insurance company authorized to do business in the jurisdictions where the Contractor's obligations under this Agreement are to be performed, the following insurance coverage:

(a)    commercial general liability insurance with a limit of not less than $5,000,000.00 per occurrence for bodily injury and property damage; and

(b)    errors and omissions insurance with a limit of not less than $5,000,000.00 per occurrence covering all damages specifically arising out of the performance of the Services.

The Contractor shall ensure that Goldcorp and MRS be named as an additional insured for the purposes of this section. Upon request from Goldcorp or MRS, the Contractor shall deliver to Goldcorp a certified copy of an insurance policy or a certificate of insurance stating that the insurance required under this Agreement is in good standing.

26. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws in effect in the state of Nevada.

27. **Dispute Resolution** If the parties have a dispute relating to this Agreement, then either party may give written notice of the dispute to the other party, in which case the parties shall use commercially reasonable efforts to negotiate a resolution to the dispute. If the dispute is not resolved within five (5) business days after delivery of the above notice, then the dispute shall be referred to and exclusively resolved with finality by arbitration administered by a single arbitrator pursuant to its rules; however, a party may apply to a court of competent jurisdiction for interim protection or equitable relief such as an interlocutory or interim injunction. The place of arbitration shall be Reno, Nevada. The arbitrator must be qualified with respect to the matter in dispute and must not be related to either party. The parties agree that the arbitration shall be kept confidential and that the existence of the proceeding and any element of it (including but not limited to any pleadings, briefs or other documents submitted or exchanged, any testimony or other oral submissions, and any awards) shall not be disclosed beyond the tribunal, the parties, their counsel and any person necessary for the conduct of the proceeding, except as may be lawfully required in judicial proceedings relating to the arbitration or otherwise. Any documents marked "without prejudice" and exchanged in an effort to negotiate a settlement to the dispute shall not be admitted as part of

12

the arbitration. The parties shall continue performing their obligations under this Agreement during the dispute resolution or arbitration process, until this Agreement is terminated pursuant to its terms.

28. **Relationship.** The Contractor and the Contractor's Personnel are independent contractors and are not employees of MRS. Neither party is the agent, partner or employee of the other party. The Contractor is and at all times shall be the sole employer of the Key Individuals, and as such the Contractor solely assumes any and all legal, tax and other obligations or liabilities resulting from or relative to its status as employer. Without limiting the generality of the foregoing, the Contractor shall be responsible for (i) withholding and remitting income tax, contributing to employment insurance and governmental pension plan(s), remitting payroll taxes and levies, as well as securing workers' compensation coverage for the Key Individuals, and (ii) complying with employment standards including without limitation the obligation to pay the Key Individuals no less than such wages to which he is entitled according to law. The Contractor may contract with third parties as long as the provision of services to third parties does not interfere with the Contractor's obligations under this Agreement.

29. **Assignment.** This Agreement and any obligation under or interest in this Agreement may not be assigned, transferred or subcontracted without the express written consent of the other party. Notwithstanding the foregoing, MRS may assign this Agreement to any current or future affiliate of MRS.

30. **Time.** Time is of the essence in this Agreement.

31. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to its subject matter and there are no representations or warranties (express or implied, statutory or otherwise) and no agreements collateral to this Agreement, other than as expressly set out in this Agreement.

32. **Invalidity.** The invalidity or unenforceability of any term or provision of this Agreement shall not affect any other term or provision of this Agreement; the remaining terms and provisions shall continue in full force and effect. The parties shall negotiate in good faith to agree to a substitute term that shall be as close as possible to the intention of any invalid or unenforceable term while being valid and enforceable. The invalidity or unenforceability of any term in any particular jurisdiction shall not affect its validity or enforceability in any other jurisdiction where it is valid or enforceable.

33. **Amendment.** This Agreement may be amended from time to time only by a written agreement signed by each party.

34. **Enurement.** This Agreement shall enure to the benefit of and be binding upon the parties and their lawful successors and permitted assigns.

35. **Independent Legal Advice.** MRS has recommended that the Contractor obtain independent legal advice regarding this Agreement and its effect. The Contractor represents that it has done so or has voluntarily chosen not to do so.

36. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same document. Each party shall be entitled to rely on delivery of an electronic or facsimile copy of this

13

Agreement, and acceptance by either party of an electronic or facsimile copy of this Agreement shall create a legal, valid and binding agreement between the parties in accordance with the terms hereof.

The parties executed this Agreement as of the Effective Date.

**METAL RECOVERY SOLUTIONS**          GEO-LOGIC ASSOCIATES

by: _____          by: _____.
Signature of Authorized Signatory          Signature of Authorized Signatory

its:          President          its: _____.
Title of Authorized Signatory          Title of Authorized Signatory

# Exhibit "B"

# Exhibit "B"

WORK ORDER
PURSUANT TO SERVICES AGREEMENT

**Work Order Number: 2-B Hydro-Jex Operation, Phase IIb, at Los Filos Mine**
**Date: May 13, 2016**

This Work Order is made between Geo-Logic Associates
dba Applied Soil Water Technologies ("GLA", the "**Subcontractor**") and **Metal Recovery Solutions, Inc.**
("MRS" the "**Contractor**") dated **May 13, 2016** (the "**Agreement**").

1. **Services.** The Services are as follows: [e.g., Subcontractor shall provide the services of professional and suitably qualified individuals who shall] provide operational services and deliver the Work Product as directed by Goldcorp & MRS from time to time. The professional(s) shall work up to 12 hrs per day and 72 hours (crew may work 84 hours if crew unanimously agree) per week, in accordance with Goldcorp's and MRS requirements and specifications.

2. **Key Individuals.** The Key Individuals within Geo-Logic Associates who shall provide the Services are, Guido Zamora or otherwise qualified manager available to supervise the work, and Geo-Logic Associates, dba Applied Soil Water Technologies, Inc.

3. **Deliverables.** The Subcontractor shall provide the following deliverables (each of which is a "**Deliverable**") on the following dates:

   **Hydro-Jex® Operations**
   1. Transport crews and engineers to Mexico City for Goldcorp to transport to Mine Site.
   2. Support crew, engineers, and managers in up to 2 days safety training on site.
   3. This Phase IIb of work includes the stimulation of 11 wells totaling approximately 1,020 total feet in depth and 51 individual zones.
   4. Operate all equipment, tools, boom truck, generators, pumps, pickup and follow Dr. Seal's expertise to deliver 170,000+ gallons (644 m3) per zone of barren solution & stimulate the Hydro-Jex® wells.
      - Operate equipment, supplies, parts, filters and maintenance, etc. on Hydro-Jex® technology, 10-12 hrs a day, up to 7 days a week.
      - Work schedule will be 20 days on and 10 days off
      - Operate, train for rinse technology plan, down-well equipment for wells.
      - Maintain operation data base of collected operational parameters.
      - Follow MRS and GoldCorp's Safety and Operational plans and record data as required.
      - Provide clothes, raingear and steel toe boots for crew.
      - Provide insurance for crew (medical, liability, taxes).
      - Dedication to safety
      - Team approach to complete and implement the project in a timely fashion
   5. Provide Goldcorp with a weekly report on progress (spreadsheet).
   6. Train Goldcorp's operators in the use and optimizing the rinse/re-leach equipment.

4. **Specifications.** The Deliverables shall conform to the following Specifications:

   Safety, security and efficiency in the operation of the of Hydro-Jex® technology at the Los Filos Mine. Follow Goldcorp's Golden Guide and MRS's Safety Policy.

5. **Fees.** MRS agrees to the following rates, expenses, reimbursement and payment procedures:
   - GLA must obtain official approval from MRS to work on the project.

2

- Project Manager: $5,754/month (US) or $195/day, Support Staff: $4,317/month or $144/day (actual costs) (20 days on 10 days off) (assume 2-3 support personnel as needed and depending on whether or not working night shift). A safety and performance bonus may be given to the support personnel with contractor and subcontractors agreement.
- Pay all GLA travel costs.
- Pay all GLA meal and lodging expenses.
- Pay for or provide Personal Protection Equipment (PPE) such as hard hat, gloves, safety glasses, vests, ear protection, etc.
- Contractor (MRS) will promptly pay Subcontractor (GLA) for Phase IIb invoices when Contractor receives payment for the Phase IIb "total project fees" from Client (Goldcorp), as authorized in the purchase order issued to Contractor by Client. If there is an adjustment to the final invoice by Client and agreed upon by Contractor and Subcontractor, that adjusted amount will be considered the "total project fees" for Phase IIb.
- Following the completion of Phase IIb, all Phase IIb costs (time and expenses) charged to the job by both Subcontractor and Contractor will be reviewed by both parties.
- Determination of Phase IIb Gross Profit:
  - o Upon mutual agreement by Subcontractor and Contractor of all Phase IIb costs, these Phase IIb costs will be deducted from the total project fees billed for Phase IIb by Contractor to the Client. The deduction of the Phase IIb costs from the total project fees is referred to as the Phase IIb Gross Profit.
  - o The contractor will identify costs for the Phase IIb project including maintenance, supplies, equipment, parts, tools, shipment and logistics, travel, meals, lodging for operation engineers and technicians, and other direct costs associated with the Hydro-Jex operation as determined by the contractor that also will be deducted from the total project fees prior to determining Phase IIb Gross profits.
  - o After determination of Phase IIb Gross Profit, Subcontractor will then invoice Contractor for 30% of the Phase IIb Gross Profit.
  - o Subcontractor will submit invoices to Contractor on a monthly basis for all time and expenses accrued for Phase IIb in accordance with the rates above for the onsite Project Manager and Support Staff. Subcontractor will not bill Contractor for any Professional time allocated to the project from either GLA Peru or GLA U.S. If Subcontractor's Professional staff travel to the project site in Mexico the travel expenses (flights and other expenses) only will be billed to the Contractor. The Contractor will also not charge any Professional time to the project during travel except as set forth previously in this Section. The Contractor will charge, however, all travel expenses, maintenance, tools, supplies, parts, equipment, and incidentals to the operation of the project. If the Contractor is required to hire additional personnel to assist with the onsite Phase IIb work, the time and expenses for the additional personnel will be charged to the project as costs. The contractor has all decision capacity in regard to personnel being hired for Phase IIb with guidance from the subcontractor and will coordinate safety, travel, training and operations with the crews.

6. **Term.** The Contractor shall begin providing the services under this work order on **May 13, 2016.** The term of this work order shall end on **August 9, 2016** or on such other date as agreed upon in writing by the parties.

Work-Order-2 Hydro-Jex Operations Phase IIb_GLA_MRS_5-10-16

3

The parties executed this Work Order as of the date first set-out above.

GEO-LOGIC ASSOCIATES

by: _____
Signature of Authorized Signatory

its: _____Principal_____
Title of Authorized Signatory

METAL RECOVERY SOLUTIONS, INC.

by: _____
Signature of Authorized Signatory

its:  President
Title of Authorized Signatory